Good morning, and may it please the Court. Jennifer Bennett on behalf of the appellants, Michael and Charlisa Determan, parents of Lance Corporal Matthew Determan. I'm going to try to keep an eye on my time and reserve about three minutes for rebuttal. As this Court has repeatedly explained, the essence of the government contractor defense is, it's not my fault, the government made me do it. And because we were on summary judgment here, it is the contractor's burden to prove that every reasonable juror would say that the government made them defectively design, test, and manufacture the particle separator that killed Matthew Determan. The contractors did not meet that burden, and that's for two reasons. First, the government gave the contractors almost complete freedom to design the particle separator in whatever way they chose, subject to only very general performance standards. The design and testing choice of this particle separator were made by the contractors, not by the government, and so it couldn't possibly have been an exercise of the government's discretion. And the second reason they have not met their burden is that there's evidence that the particle separator didn't even meet the performance standards that the government set. And I'll start by discussing the second reason, because you don't even need to get to the first reason, given the evidence on the second one. So to turn to that, the second prong of the government contractor defense, one of the few things the government did require of the contractors was a particle separator that could filter out a certain percentage of certain size particles. But seemingly unbeknownst to the Navy, when it signed off on the contract, the contractors had analysis demonstrating that the particle separator did not, in fact, meet the efficiency standards the government had set. That is, that it filtered out fewer particles than the government told it it had to. And this accords with the finding of the crash investigation, that too much sand and dust got into the engine. Now the contractors, they don't dispute that evidence that suggests that the particle separator didn't meet these standards for how much had to get out, how much it had to filter out. They don't dispute the evidence that demonstrates that the separator didn't meet those standards would undermine the government contractor defense at this point, and that they would not be entitled to summary judgment. What they say, and what they ask the district court to hold, is that this evidence is irrelevant as a matter of law. In other words, no reasonable juror could possibly infer from this evidence that the contractors did not meet the government's standards. And that's just not the case. The main argument they make is that the sand used in conducting this analysis had some very small particles in it. Some small percentage of the sand had very small particles, and the government didn't have any standards about these very small particles. And so they say that it's just totally irrelevant. And particularly, they explain the way a particle separator works is that it's better at filtering out big particles than small particles. So the fact that they tested on it sand that has some tiny particles means that it's not going to work as well. So of course it didn't meet the government's standards in that situation. But there's evidence in the record to show that their explanation is not necessarily true. So first, at the excerpts of 626, we show that the tests of the prototype for the particle separator result in almost the same efficiency for small and large particles. So this idea that the government is better at filtering out large particles than small particles is just not true. And we see that in other places in the record as well. When they were testing various prototypes, very slight variations in the particle separator would mean that it filtered out small particles great, but actually large particles were the particles it had trouble with, because they would go bouncing all over the place, apparently. I'm not an expert in particle engineering, but that is my understanding. And that evidence is, for example, on ER-492, ER-789. So we have lots of evidence in the record, in fact, that actually this particle separator is not necessarily better at filtering out large particles than it is at filtering out small particles. And in fact, in many cases, it's the reverse. So if the particle separator fails to meet the basic performance requirements when there are some extra small particles included in the test stand, that may in fact demonstrate that an even worse problem when it comes to the large particles and what the government was concerned about. And given that at this stage, all inferences have to be drawn in favor of the detriments, it's certainly sufficient to create a dispute of fact as to whether the particle separator in fact complied with the government's requirements. And that's all that's needed to reverse here. Now the evidence doesn't come from the specific aircraft that failed, but again, a reasonable juror could certainly infer that if the general particle separator doesn't meet the standards, so too will every other particle separator. And in fact, the contractors don't argue that there's any difference between the particle separator this analysis comes from and the one that was on the aircraft that crashed. Didn't meet the specification for the 20 micron particles? It's actually, you know, it's not clear. So there are some tests of a prototype in the record that show after a bunch of jiggering that it met the it met the specifications for 20 microns, but then we also have this analysis later that the government didn't know about that shows that it might not have met those specifications. Didn't that analysis show, wasn't the subject of that analysis particles that was smaller than 20 microns? The subject of that analysis, as I understand it, was sand that included a wide variety of particles. So I believe 70% of the sand in that analysis did include 20 microns or greater, and 30% included sand that was smaller than 20 microns. And so to the extent that there's evidence, particularly since there's evidence, that it is better at filtering out small particles than large particles, a reasonable juror could take a look at this and say, I can infer from this that it probably didn't meet the government standards. And that's all there is here. They have to prove that no reasonable juror could possibly infer from this evidence that they didn't meet the standard. And that's just not the case. And so for that reason alone, that reason alone is sufficient to reverse the district court here. But I want to move on briefly to the first prong of the government contractor defense, which also is not met here. So the contractors have also failed to establish that the government approved reasonably precise specifications to begin with. And I think here, before diving into the facts, it's helpful to take a step back and talk about what this prong is getting at. The government contractor defense is federal common law. And it stems from the Federal Tort Claims Act, which is about the government's liability, not contractors' liability. And what the Federal Tort Claims Act says is the government is liable for its own harms, except when it's pursuing a discretionary function. And in Boyle, the Supreme Court said, we're going to graft some federal common law onto this exception. And we're going to say, if the thing you're suing about is a discretionary function, even if you're suing a contractor and not the government, we're going to say there's a defense. So in other words, what Boyle says is, if you can say the government made me do it, if you can say it's the government's choices and not my choices, then there's a defense. If you can't say that, if it's the contractor's exercising discretion and not the government, then there's no defense. And so the point of this first prong, the point of the requirement that the specifications be precise, is that the discretion over significant details and design choices has to be exercised by the government in order for the defense to apply. If the government only gives the contractor general guidelines, imprecise specifications, and then delegates to the contractor all of the important design choices, it's the contractor's discretion and not the government's discretion that is at issue. And the government contractor defense just simply doesn't apply in that case. And that's exactly what happened here. Here, the government gave the contractors almost complete freedom to design whatever they wanted. All the government said is, make sure a certain percentage of certain sized particles stay out, minimize the intake of everything else, and make it integral to the intake system. Oh, yeah, and make it self-cleaning. That's it. That's like if the government went to Home Depot and said, in the example of Boyle, I want an air conditioner that cools a room to 70 degrees, and I want it to be a window air conditioner, not a central air conditioner. And that's it. Then all of the discretion to design that air conditioner, all of the discretion to design how this particle separator actually worked, was the government's. And in fact, there's a language in the contract that explicitly says the point of this is to allow the contractor's quote, flexibility. That's the opposite of the government made me do it. And if this court held in Snell, that is just not enough. When the government imposes only minimal or very general requirements for the contractor, the defense is inapplicable. And that's certainly the case here. And I just want to briefly address the government's argument, rather the contractor's that this is all remedied because eventually the government rubber-stamped its designs. And what this court's cases have held over and over again is that a rubber stamp is just not enough. There has to be, in the words of Goetz, substantial substantive involvement in the decision-making process by the government. The government has to, in adopting the design choices the contractor made, actually have thoroughly reviewed those choices, actually been involved, actually thought about that. And there's no evidence at all that the government did so here. And I just reserve, if there are no further questions, I'll reserve the remainder for rebuttal. Thank you. Good morning, and may it please the court. I'm Eric Wolf. I'm counsel for Boeing, and I'm here on behalf of all the defendants. And with me at council table is Mr. Scoville and Mr. Norwood. It was a very tragic accident, and I think that Ms. Bennett is arguing as vigorously as possible in support of her clients. But on a number of issues, the record really does not support what I just heard. And I think it probably makes the most sense to kind of walk through it from the beginning, and then at the end I'll address this PowerPoint slide that she began with, which has to do with self-cleaning. So back in the mid-80s, the way this program starts, at least as we get to this particle separator component, is the contractors and the government are in negotiations over how to do this. The government picks the design, and to say that, you know, we just have performance standards here, let me be very clear about this. When the specification says self-cleaning system, that right there is a significant policy choice by the military. So you can go two directions on things like this, and military aircraft frequently present situations like this where, you know, we can do a filter, but the problem with a filter is it chokes off too much air to the engine. And we want big, high performance engines because we're going to fly up out of places where they're shooting at us and fly away really fast. So the military right there has to make a trade-off. And if you go to the declaration of Mr. Pauling, who's a Navy engineer in the Navy program, who's very familiar with this program, he talks all about this. Like, that's a trade-off we made, we didn't want the filter. So filters aren't self-cleaning, so when they go with a self-cleaning system, they're making a trade-off and a policy decision, we don't want the filter. So they pick what is this inertial system. So what happens is the air comes rushing in, you make it fly around corners, and then the particles can't make the corner, and then they fly away and they get blown out. So that's the first design choice that the military makes, which is the first prong of oil. So then we have negotiation over the specifications on, okay, how much sand needs to be screened out and at what size. And that was also negotiated with the military, so that's more back and forth. Then, and that's where you get the threshold numbers. Okay, then, and this is one of the most important things I can emphasize, and if I could do the brief today, I would have made this more prominent, is it's very important when talking about the government's involvement to read the test report and the test plan. They're both in the record. The test plan starts at excerpts of record 422, the test report starts at 422 documents, along with the declaration of Dale Sowers, who's the chief engineer for Bell, and then Mr. Pauling just really put to rest any notion that sort of, oh, the government just delegated it all to the contractors and they just figured it all out, and it's just like buying an air conditioner at Home Depot. And of course, the air conditioner example comes from the Supreme Court's decision in Boyle. They're like, you know, if you just said that's not enough government involvement. If you go to the test plan and the test report, there is no way to say that. So here's what happened. They're making this inertial system. They write up a test plan. The test plan itself specifies the type of sand that is used. It's right in there. And actually, I can give a citation on that if it's helpful. The specified sand, you can see it at excerpts of record 774 and 76 and also 879. It's right in there. So if you're using a different type of sand, you're not following the specified test procedure. So they go in to the testing with these different configurations, and it's very delicate because what's critical in that inertial system is the contours that you're making the air flow around, and they test these different contours. And actually, there was more than one that passed the efficiency standards, and they're not just testing for efficiency and getting the sand out. They're also looking at, are you distorting the air flow into the engine? And if I can make one caveat on the engine, the engine's not part of this. The engine's made by Rolls Royce. These defendants have nothing to do with the engine. It comes to them as government furnished equipment. So another piece of this is, what is the tolerance of that engine to operate with some sand in it? That's another issue. That's a Rolls Royce, not even these defendants. But as you'll see in the test report, they go through 10 different configurations. They make these little tweaks, and it is all spelled out. I mean, you got the diagrams and the math. And along with Ms. Bennett, I am also not an aerospace engineer or a particle expert or anything like that. And that's gonna be significant when I talk about conformity, because I think the only way she can make the kinds of arguments she's making is if she had expert testimony. So they test these configurations. They see what the results are for both screening out sand, but also distortion of the air flow into the engine. They pick one. Mr. Sowers testifies. The government is involved in all this. The military representatives are there. They approve the test plan. They're at the testing. He says, I had regular contact with them. I had quarterly reviews with them. That's the kind of back and forth. That's not going to Home Depot. That's working on a design with the government is okay with in terms of both screening out sand and also getting the best air flow, the air flow that the government wants to the engines. And then what they do is they digitize that. And that's the inlet, that's the contour, and that goes into the specification. And so to go to Ms. Bennett's kind of bright line headline at the beginning, the government made me do it. When they digitize those contours and they write it into the contract at that point, the government is making you do it. You have to build it that way. Bell and Boeing can't go changing anything at that point. To comply with the contract, you must build it down to the millimeter. And they specify all the materials. Every last piece of that thing is specified, and it comes right out of that testing that the government was part of. So I think that back and forth easily satisfies Boyle. Second standard is whether we have conformity. And if I could just speak to that a little bit, just to clear up the record. So the document at issue is Excerpts of Record 329. I will just... It's a single PowerPoint slide. Okay? And it's from 2011. And I wanna make one important clarification. If you look at it, it was produced by the Navy. So this notion that this was going on, the government wasn't aware, the government had no idea. This document came from the Navy. And it was part of, if I can hold up the beginning of that deck, a kick off meeting between the contractors and NAVAIR about looking at different concepts for screening out sand. Okay? So to the extent I heard, this went on, the government didn't know, that's not fair. The document comes from the Navy and the government knew, and it's from a meeting. Then we get to what it says, and it's just this small table. And it says, if you're using a particular type of sand, isochore sand, here's what we think the current EAPS system would do. And that is really a simple mathematical exercise that's based on the fineness of the sand. And the type of sand, the isochore sand, has explained in the second declaration of David Lowe, who's a team leader for the program. That type of sand that they're talking about there is a finer type of sand. And it doesn't matter whether it's finer, whether it's bigger, whatever, it's not the test sand. It's not the test sand. I'm going to use this single slide to say every V-22, I think every V-22 is out of compliance. That's not a fair inference. That is classic speculation, classic speculation. I got a stray slide, here's my speculation about it. Okay, the way that goes from speculation to a type of evidence that could stop summary judgment, you really need expert testimony, or you need to take the deposition of any reason. Did not submit declarations. They didn't take the depositions of any of these folks. They didn't put in an expert report. If they had questions... They had the test reports in October of 2016. Dale Sowers, David Lowe are all in the initial disclosures. If they had wanted to learn more about any of this, if they wanted to test... Mr. Sowers, how much... You say there was this interaction, exactly how much was it? What did you talk about? And so they could have deposed Dale Sowers. And if they wanna make the argument that this slide here at a kick off meeting is saying something significant about compliance, well then they could depose Mr. Lowe, or they could have an expert. And again, as Ms. Bennett said, I'm not a particle engineering expert. I'm not either. And the jurors aren't either. No lay juror can draw this conclusion except for speculation. And I said that was gonna be my last point. Let me say one other thing. This accident was preceded in 2013 by an accident in Nevada at Creech Air Force Base. It was very similar, very similar. And it led to a change in the operating manual. And then this accident occurred. The manual was changed to say you shouldn't hover in these brownout conditions for more than 60 seconds. And with this accident, they come in once for like 35 seconds and then they go out, and then they come back in for about 45 seconds and they get overwhelmed. And unfortunately, a decision is made, let's try and go up to get out of it. So then when the engine has a problem, they're falling even farther and there are two fatalities. That report, the command investigation report, if there's any question about any of this, it's at excerpts of record 370. It goes through the whole scenario. The Marines do not come out of that focused on, oh, I mean, they say we should look into having a better system here, but their primary criticism and their recommendations for discipline are about, you should have done a better site survey of where you were gonna land those aircraft. You should have had better supervision of those young pilots. You shouldn't have put them in this situation and you need to clear up your manual. And that's what they did. So that's how they deal with this risk. That's how they deal with the risk trade off. And there's no argument that the government didn't know about these risks. And Boyle is very clear that the contractors only have to learn about risks that the contractors know that the government is not aware of. The Navy's been well aware of these risks for a long time. The US military is the only operator of these aircraft and there have been many incidents and they have dealt with it through training and supervision. If there are no questions, I will sit down. Thank you, Counselor. Thank you. I just wanna address some of the comments that the contractors council have made. So first, we agree that there was back and forth, there's evidence of back and forth on the initial general performance standards of how much is it gonna filter out. The government said, we want a high number. The contractor said, that's gonna take us a long time. Let's have a lower number. And there was back and forth about that. And we agree that the government decided that it should be generally a particle separator. But that, if you look closely at the record, that's where the back and forth begins. After that, there is no evidence at all of the government's involvement in any substantive choice of how to then design a particle separator that filters out X percentage of particles. None. There's literally nothing in the record about that. And the contractor cite the testing and they say... First, they say there was this detailed test plan. That test plan was created by the contractors. It was... And there's no evidence that the government had substantial involvement in developing it. And in fact, the declarations that they cite for that, so they cite ER 626. And all that declaration says is the government approved the report. All that shows is the government rubber stamped it. And there's specifically nothing in the record that shows that the government had anything, said anything about what kind of sand you should test with. They haven't demonstrated at all that they... Are you suggesting that there's no evidence in the record that the design specifications were incorporated into the contract? No. I agree that once the contractors designed, made the drawings of this part as well as the rest of the aircraft, that those were then incorporated into the contract. That's exactly what happened in Snell as well, where this court held that the government contractor defense doesn't apply. Where you have these broad requirements, design X kind of a thing with Y performance specification, and the contractor does all the work. The fact that at the end, the government rubber stamps it and says, okay, now manufacture this, that's not enough. This court has repeatedly held that that's not enough. The second thing I wanna mention is they say... They put a lot of emphasis on the fact that the government chose one of 10 possible configurations, and they say it's not true that only one met the specifications. That's not what the record says. If you look at ER 493, the record shows the different particle separator prototypes, and only one listed there meets the requirements. There's nothing in there... If they're saying that there were other options, that's not in the record, which means that they have not met their burden to show that at this stage. Maybe further discovery would show that, and maybe that would then go to a jury. But right now, on this record, the government had one choice. And so choosing the only choice, if I say, we only have one air conditioner that cools to 70 degrees, the fact that the government chooses that air conditioner is not saying that it is supporting or choosing or even reviewing all of the design choices that went into that particular one. It's saying, that's the only one you gave me, and that's the only one that is saying that they have to present a bunch of alternative designs. But what I am saying is that the fact that they only presented one that worked means that there couldn't have been discretion in just choosing that one. So to find the exercise of discretion in approving a design, you have to go back to what Getz says and what Snell says. There has to be detailed substantive review. And I think comparing this case to Getz is actually... Is useful here because it shows what is lacking here. So in Getz, there were regular technical meetings about this specific part as it was being designed. The government issued formal requests for information about aspects of the design. The government called its own meetings to discuss and test aspects of the part. The government even rejected the design at one point. None of this has happened here, none of it. And I see my time is up. So there... I'll finish your thought. Okay. So there is simply just no indication in the record. The briefs make these broad statements about the back and forth, but if you look at every record site, none of the record sites actually show that. None of the record sites show any involvement after the first general requirement stage beyond a rubber stamp. Thank you very much. Thank you very much to counsel for both sides for your very helpful arguments in this case. The matter is submitted.
judges: Nguyen, Owens, Vitaliano